# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Larry Holmberg,            Civil No. 11-248 (DWF/LIB)

        Plaintiff,

v.                 **MEMORANDUM**
                 **OPINION AND ORDER**

Stealth Cam, LLC,

        Defendant.

_____

Carolyn H. B. Eckart, Esq., Catherine Shultz, Esq., David R. Fairbairn, Esq., Katherine J. Rahlin, Eq., and Larrin Bergman, Esq., Kinney & Lange, PA, counsel for Plaintiff.

Michael D. Ricketts, Esq., Monica Tavakoli, Esq., Eric W. Buether, Esq., and Mark D Perantie, Buether Joe & Carpenter, LLC; Alan G. Carlson, Esq., James R. Hietala, Jr., Esq., and Joseph W. Winkels, Esq., Carlson Caspers Vandenburgh Lindquist & Schuman PA, counsel for Defendant.

_____

# INTRODUCTION

This matter is before the Court on the issue of patent claim construction pursuant to *Markman v. Westview Instruments, Inc*., 517 U.S. 370 (1996).

# BACKGROUND

This litigation involves allegations by Plaintiff Larry Holmberg ("Holmberg") that

Defendant Stealth Cam, LLC ("Stealth Cam") is infringing one or more claims of U.S.

Patent No. 6,556,245, entitled "Game Hunting Video Camera" (the "'245 Patent"); U.S.

Patent No. 7,880,793, entitled "Camera with Mounting Rail" (the "'793 Patent"); U.S.

Patent No. 8,045,038, entitled "Video Camera with Mount" (the "'038 Patent"); and U.S.

Patent No. 8,059,196, entitled "Camera for Mounting" (the "'196 Patent").  (Doc. No. 42, Second Am. Compl.)[1]  The four patents-in-suit all relate to a video camera with a mounting apparatus, and share the same specification.[2]  Holmberg is the sole inventor of the patents-in-suit.  Holmberg describes the invention in the '245 Patent as follows:

> This invention relates to a design of a video camera for recording game hunting.  More specifically it relates to a video camera design that is mountable on a weapon so a hunter can record what he or she sees as he or she is hunting without the help of a third party and without the limitations of related art.

('245 Patent, c. 1, ll: 15-20.)

Stealth Cam manufactures and sells digital cameras and accessories for outdoor pursuit applications, including light-weight digital video cameras for use during activities such as biking, paddling, and snowboarding.

---

[1]     The patents-in-suit are included as exhibits to the Second Amended Complaint; the '793 Patent is attached as Exhibit A; the '245 Patent is attached as Exhibit B; the '038 Patent is attached as Exhibit C; and the '196 Patent is attached as Exhibit D.  All future citations to the patents in this case refer to these exhibits.

[2]     The '245 Patent issued on April 29, 2003.  ('245 Patent at 1.)  Holmberg filed the application for the '793 Patent on May 29, 2009, as a continuation of an application that was related to the '245 Patent application.  ('793 Patent at 1.)  Holmberg filed the application for the '038 Patent on October 1, 2009, as a continuation of the same application for the '793 Patent.  ('038 Patent at 1.)  Holmberg filed the application for the '196 Patent on December 3, 2008, as a continuation of the same application for the '793 Patent.  ('196 Patent at 1.)

## DISCUSSION

### I.    Claim Construction Principles

Patent claim construction, i.e., the interpretation of the patent claims that define

the scope of the patent, is a matter of law for the court.  *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996).

Proper claim construction requires an examination of the intrinsic evidence of record,

including the claim language, the specification, and the prosecution history.  *Bell Atl.*

*Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir.

2001); *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The

starting point for claim construction is a review of the words of the claims themselves.

*Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citation

omitted); *see also Vitronics*, 90 F.3d at 1582 ("First, we look to the words of the claims

themselves, both asserted and unasserted, to define the scope of the patented invention.").

The words of a claim generally carry "the meaning that the term would have to a person

of ordinary skill in the art at the time of the invention."  *Phillips*, 415 F.3d at 1313.

Claims must also be read in view of the specification.  *Id.* at 1315.  The specification is

always "highly relevant" to claim construction and "the single best guide to the meaning

of a disputed term."  *Id*. (citing *Vitronics*, 90 F.3d at 1582.)  The specification

"necessarily informs the proper construction of the claims."  *Phillips*, 415 F.3d at 1316

(explaining that the claims must be construed so as to be consistent with the

specification) (citation omitted).

The specification may prescribe a special definition given to a claim term that differs from the meaning it would otherwise possess, or it may reveal a disavowal or disclaimer of claim scope by the inventor.  *Id.*  In such cases, the intention that is expressed by the inventor in the specification is dispositive.  *Id.*  The Court may not, however, import limitations from the specification into the claims.  *Id.* at 1323.  To avoid importing limitations from the specification into the claims, the Court considers that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.  *Id.*

A patent's abstract and summary of the invention can be particularly relevant when construing the meaning of disputed claim terms, as they sometimes contain statements describing the invention as a whole.  *See, e.g.*, *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (explaining that statements that describe the invention as a whole are more likely to support a limiting definition of a claim term and that certain sections of a specification are more likely to contain such statements); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001).

The Court should also consider the patent's prosecution history, which provides evidence of how the United States Patent and Trademark Office ("USPTO") and the inventor understood the patent.  *Phillips*, 415 F.3d at 1317.  The prosecution history "consists of the complete record of the proceedings before the [USPTO] and includes the prior art cited during the examination of the patent."  *Id.* at 1317.  The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor

understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*. (citing *Vitronics*, 90 F.3d at 1582–83). The doctrine of prosecution disclaimer "preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "By distinguishing the claimed invention over prior art, an inventor indicates what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). An explicit statement made by an applicant during a patent's prosecution to distinguish the claimed invention over prior art may serve to narrow the scope of the claim. *Spectrum Int'l*, 164 F.3d at 1378.

A court may, in its discretion, consider extrinsic evidence, though such evidence is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1317-18. In most situations, intrinsic evidence will resolve any ambiguity in a disputed term, and when it does so, the court may not rely on extrinsic evidence. *Vitronics*, 90 F.3d at 1583.

Once a court interprets a claim term, it should interpret the claim term consistently throughout the patent. *Phillips*, 415 F.3d at 1314. In addition, when a parent patent and its continuation patents share common claim terms, a court should interpret those claim terms consistently across the related patents. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

## II.      Claim Construction

### A.      Scope of the Invention

As an initial matter, the parties dispute whether Holmberg disclaimed that the scope of his invention extended beyond a video camera capable of being mounted to a weapon for use in game hunting.  Stealth Cam contends that all of the asserted claims of the patents-in-suit are limited to a video camera capable of being mounted to a weapon for use in game hunting.  In support, Stealth Cam asserts that during the prosecution of the application that resulted in the '245 Patent, Holmberg explicitly narrowed the scope of this invention to a video camera capable of being mounted to a weapon for use in game hunting in order to distinguish his invention over the prior art.  Stealth Cam further asserts that Holmberg made the same disclaimer during the prosecution of his next patent application, which resulted in the '793 Patent, and that Holmberg cannot later recapture the scope of the invention that was surrendered.

Holmberg asserts that he did not make any explicitly limiting statements regarding his invention during prosecution, but rather merely stated the capabilities of his invention.  Holmberg further asserts that the statements regarding the capabilities of the invention are not disclaimers of subject matter.

For the reasons discussed below, the Court concludes that Holmberg limited the scope of his invention to "a video camera capable of being mounted to a weapon for use in game hunting."   In both the Abstract and later in the specification, Holmberg specifically describes the invention as a video camera mountable on a weapon.   In the first line of the Abstract of the '245 Patent, Holmberg states:  "A video camera is

disclosed that can be mounted to a firearm or bow for recording game hunting." ('245

Patent, Abstract.)  In addition, the Background of the Invention reads in part:

> *This invention* relates to a design of a video camera for recording game
> hunting.  More specifically it relates to a video camera design that is
> mountable on a weapon so a hunter can record what he or she sees as he or
> she is hunting without the help of a third party and without the limitations
> of related art.  Game hunting videos are very popular to the sportsman, both
> as an instruction tool and a way of capturing the hunt on film.

('245 Patent, c. 1, ll: 15-22 (emphasis added).)   The use of the term "invention" when

describing the scope of the invention underscores that Holmberg limited the otherwise

broad claim language.  *See, e.g.*, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314,

1321-22 (Fed. Cir. 2011); *C.R. Bard, Inc.*, 388 F.3d at 864.

In addition, the '245 Patent's specification describes the Figures in the

specification as depicting embodiments of "the game hunting camera."  For example, in

the Brief Description of Drawings, Holmberg explains that the figures represent

particular views, representations, or diagrams of embodiments of "the game hunting

video camera."  (*See, e.g.*, '245 Patent, c. 2, ll: 15-67.)  Holmberg also describes his

invention as follows:

> I have invented a video camera for game hunting that is simple and efficient
> to use in hunting situations and overcomes the limitations of the related art.

('245 Patent, c. 2, ll: 10-12.)

> I have designed a game hunters [sic] video camera that overcomes the
> limitations of the prior art.  My video camera is designed for hunting
> situations where the ease of use and ability to function properly and quickly
> in extreme situations and weather conditions are paramount to filming the
> hunting experience.

('245 Patent, c. 6, ll: 62-67.)

Further, during the prosecution of the application for the '245 Patent, Holmberg filed an Information Disclosure Statement ("IDS").  (Doc. No. 70, Ex. E ("IDS").)  In the IDS, Holmberg states "the *present invention* provides a video camera that is capable of being mounted on a weapon for recording game hunting."  (IDS at 3-4 (emphasis added).)  In distinguishing the invention from prior art, Holmberg points out the novel and non-obvious features of his invention, including "a design where the mechanisms for operation are simple and natural to use in association with the weapon upon which it is attached, and a design that is capable of withstanding harsh conditions likely to be encountered while game hunting."  (*Id*. at 4.)   Holmberg also explains the prior art in the '245 Patent specification:

> A gun mounted video camera is disclosed in U.S. Pat. No. 4,835,621 (Black).  This patent discloses a device that looks like a rifle but is really just [sic] video camera recording device.
> Video cameras mounted to firearms with head mounted video displays are disclosed in the following patents . . . .  These patents relate to using a video camera to transmit a video signal to a head mounted video display for aiming purposes and are generally designed for military or police purposes *not for recording game hunting*.

('245 Patent, c. 1, ll: 30-43 (emphasis added).)[3]

Moreover, during the prosecution of the application for the '793 Patent, Holmberg filed a response to an office action, in which he distinguished his invention from cited

---

[3]     This same prosecution history disclaimer appears in the other patents-in-suit. ('793 Patent, c. 1, ll: 23-35; '038 Patent, c. 1, ll: 22-35; '196 Patent, c. 1, ll: 25-38.)

prior art, including the Black Patent, U.S. Patent No. 4,835,621 (gun mounted video camera).  Holmberg distinguishes his invention as follows:

> Black discloses a video camera recording device incorporated into a gun-*like* mounting structure.  Black '621, abstract.  A conventional video camera has been incorporated into a structure resembling a rifle, but Black's device includes no ammunition or the ability to kill prey.  Black '621, col. 1, ll. 44-col. 2, ll. 59.  In contrast, the presently claimed invention is a camera for mounting on a functioning weapon having ammunition and the ability to kill prey, so that a hunter can film while hunting and relive the hunt at a later time.  Further, Black describes recess 68 in *gunstock* 13 for holding conventional nine volt battery 69.  Black '621, FIG. 6, col. 5, ll. 48-59.  Since Black does not teach or suggest a camera to be used with a functioning weapon or a battery compartment located within the camera housing, claims 1 and 11 are patentable thereover.  Since claims 2-3 and 5-10 depend from claim 1, and claims 12-13, 15-20 depend from claim 11, they are patentable over Black when submitted therewith.

(Doc. No. 70, Ex. F. at 5-6.)

The Court concludes that Holmberg repeatedly emphasized, in both the patent specification and the prosecution history, that the invention provides a video camera that is capable of being mounted on a weapon for recording game hunting.  The language in the specification and the arguments made during the patent's prosecution, both discussed above, go beyond statements about general capabilities; instead, Holmberg clearly indicated that the scope of his invention was limited to a video camera capable of being mounted to a weapon for use in game hunting.

## B.    Disputed Claims

### 1.    "whereby a hunter can monitor and record a hunt"

The parties dispute the meaning of the term "whereby a hunter can monitor and record a hunt" as it appears in claim 8 of the '245 Patent:

> 8.   A video camera recorder in combination with a bow comprising:
> a main camera body having a front and back end; a bow; and
> a means for mounting the main camera body to a counter weight bar of
>     the bow whereby a hunter can monitor and record a hunt.

('245 Patent c. 8, ll: 43-49.)  Holmberg contends that the term "whereby a hunter can monitor and record a hunt" should be construed as "allowing a hunter to record the hunt with the camera as he watches or observes the hunt."  (Doc. No. 63 at 10.)  Stealth Cam contends that the term is properly construed as "whereby a hunter can use the camera to view and record a hunt."  (Hearing Tr. at 53.)[4]

Holmberg asserts that the specification is consistent with his proposed construction, namely that the camera is positioned so that the hunter can easily record the hunt with the camera as he observes the hunt.  (*See* '245 Patent, c. 3, ll: 38-41 ("When the hunter sees game he or she simply rotates the liquid crystal display housing member **18** about its hinges **11**.  This action closes the camera record switch **30** completing the circuit that starts the video camera recording."); Figs. 18, 19.)  Holmberg also asserts that the dictionary definition of "monitor" that is most consistent with the intrinsic evidence is "to watch, observe, or check, esp. for a special purpose."  (Doc. No. 66, Shultz Decl. ¶ 6, Ex. E, *Webster's New Int'l Dictionary* 1460 (Philip B. Gove ed., 3d ed. 1986).)

Stealth Cam contends that this phrase is part of the last element of claim 8, which relates to the positioning of the camera on a bow to enable a hunter to view through the camera what the camera is recording during a hunt.  Stealth Cam proposes that the

---

[4]    Initially, Stealth Cam proposed that the term be construed as "whereby a hunter can view and record a hunt at the time of the hunt."  Stealth Cam altered its proposed construction at the *Markman* hearing.  (Hearing Tr. at 53.)

monitor aspect of the claim requires that the display, or the camera through the display, enable the hunter to see what is being recorded while hunting.  (Hearing Tr. at 53.)  In support, Stealth Cam points to the Abstract, which reads, in part:  "A video camera is disclosed that can be mounted to a firearm or bow for recording game hunting. . . .  The camera has a liquid crystal display so the hunter can monitor what the camera is recording."  ('245 Patent, Abstract.)  Stealth Cam also points to the specification:  "The video camera has a liquid crystal display that allows the hunter to see what the camera is recording."  ('245 Patent, c.1, ll: 65-67.)  In addition, Stealth Cam asserts that Figures 4, 10, and 11, depict the "liquid crystal display **36**" as capable of allowing a hunter to see what the camera is recording, so the hunter can monitor the hunt at the time of the hunt.

The parties' dispute over the meaning of this phrase centers on the meaning of the word "monitor."  Holmberg's proposed construction would allow the "monitoring" to be done by the hunter with or without using the display.  Specifically, Holmberg asserts that the display need not be on for the hunter to record.  ('245 Patent, c. 4, ll: 34-45.)[5] Stealth Cam asserts that Holmberg's proposed construction is contrary to the teaching of the intrinsic evidence.  Stealth Cam claims that the specification teaches that the camera has a display that allows the hunter to monitor what the camera is recording.  (*See* '245 Patent, Abstract ("The camera has a liquid crystal display so that the hunter can monitor what the camera is recording"); '245 Patent, c. 1, ll: 65-67 ("The video camera has a

---

[5]     Holmberg points out that in a second embodiment, the display is always on.  ('245 Patent, c. 5, ll: 4-7.)

liquid crystal display that allows the hunter to see what the camera is recording"); '793

Patent, Abstract ("[t]he display is configured for viewing the recorded images").)

The Court concludes that the monitor aspect of the claim term requires that the

camera display enable the hunter to see what is being recorded at the time of the hunt.

The claim language relates to the positioning of the camera on the bow to enable a hunter

to monitor and record.  The claim language requires that the display be capable of

displaying the images recorded.[6]  Holmberg's proposed construction improperly

eliminates that requirement.  Accordingly, the Court construes the disputed term as

"whereby a hunter can use the camera to view and record a hunt."

> ### 2.   "display"

The parties dispute the meaning of the term "display" as it appears in claims 1

and 20 of the '038 Patent, and claim 10 of the '196 Patent:

> **1**.  A camera for mounting to a weapon, the camera comprising:
> a housing;
> a camera lens located at the front end of the housing;
> a video recorder located within the housing for recording images
>     captured by the camera lens;
> a cover coupled to a rear end of the housing for accessing components
>     located within the housing;
> a display attached to the housing; and
> a mounting rail extending parallel to the housing.

('038 Patent, c. 6, ll: 25-34.)

---

[6]      A hunter is always free to watch the hunt personally without the claimed camera,
but the claim language requires the capability to watch the recorded images on the
display.

**20**.  A camera comprising:
a camera body having a lens at front end and a cover at the rear end;
a video recorder located within the camera body between the front and
    rear ends;
a batter compartment connected to the video recorder;
a display attached to the camera housing; and
a mounting rail extending parallel to the camera body for mounting the
    camera to a weapon.

('038 Patent, c. 8, ll: 9-17.)

**10**.  A apparatus comprising:
an elongated sealed housing having a front end and a rear end;
a camera lens located at the front end of the housing;
a video recorder located within the housing for and positioned to receive
    images from the camera lens;
a display attached to the housing; and
a mounting rail located on an exterior surface of the housing for
    mounting the housing to an object.

('196 Patent, c. 6, ll: 56-64.)

Holmberg asserts that the term "display" should be construed as "a device that
gives information in a visual form."  (Doc. No. 63 at 11.)  Stealth Cam contends that the
term is properly construed as "a device capable of displaying recorded images" and
further that it is "is movably attached to the main camera body and acts as a lens cover
when the video camera is not in use."  (Hearing Tr. at 60- 61.)

Holmberg asserts that the term display is clear on its face and that no interpretation
is required.  (Hearing Tr. at 49.)  In the event that the Court does construe this term,
Holmberg submits that no specific type of visual information is required to appear on the
display, and that in some embodiments, the display can allow a hunter to view the
recorded images, while in other embodiments, the display simply shows information
from operating controls, such as whether the device is on, the battery level, etc.  (Doc.

No. 63 at 12-13 (citing '038 Patent, c. 3, ll: 26-33).)  Holmberg submits that the display

not only plays back recorded images, but it also gives additional information.  (Doc. No.

63 at 13.)  Holmberg argues that Stealth Cam's proposed instruction improperly reads

limitations from the specification into the claims, as the claims do not require the display

to show the recorded images, to be movably attached to the main camera body, or to act

as a lens cover.

Stealth Cam originally proposed a construction that, in part, provided "a device for

viewing the recorded images," but later offered a modified construction clarifying that it

was not arguing that the display of recorded images is the *only* capability of the display.

Instead, Stealth Cam asserts that the display must *at least* display recorded images (either

at the time of the hunt or later), even if it can also display other information.  (Hearing Tr.

at 61-62.)

As discussed above, the specification of the '245 Patent and the '793 Patent

repeatedly teaches that the display allows a hunter to view images recorded by the

camera.  For example:

> The camera has a liquid crystal display so the hunter can monitor what the
> camera is recording.  ('245 Patent, Abstract.)

> The video camera has a liquid crystal display that allows the hunter to see
> what the camera is recording.  ('245 Patent, c. 1, ll: 65-67.)

The statements in the specification are general in nature and apply to the invention as a

whole.  Holmberg appears to concede the point that the display must at least have the

ability to display recorded images.  (Doc. No. 63 at 13.)  Thus, the Court concludes that

the term display is properly construed as "a device capable of displaying recorded images."

Stealth Cam also argues that the specifications of the '038 and '196 Patents support the second portion of its proposed construction, namely that "the device is contained in a housing that is movably attached to the main camera body and acts as a lens cover when the video camera is not in use."  In support, Stealth Cam cites to the specification, which describes the display as being movable and indicating that the display can also protect the lens when the video camera is turned off.  ('038 Patent, c. 2, ll: 53- c. 3, ll:18.)  The specification notes that protecting the lens is "an important feature because the video camera is likely to be exposed to harsh environments as a hunter pursues his or her game."  (*Id.* c. 3, ll: 2-5.)  The specification also explains that when a hunter sees game, he or she rotates the display, which closes the camera record switch and starts the recording, noting that "[t]he ease and speed in which the video camera is started is very important in a hunting situation."  (*Id.* c. 3, ll: 11-13.)  Finally, Stealth Cam cites to the prosecution history, arguing that Holmberg described the critical features of his invention and disclaiming scope for a display that was not movable and acted as a lens cover when the camera was not in use.

Holmberg disputes that the claims require the display to be movably attached to the main camera body or that it act as a lens cover.  Holmberg submits that the fact that these embodiments add extra functions to the display does not mean that the term "display" requires performance of all of these functions.  Holmberg also contends that

Stealth Cam has mischaracterized the prosecution history and is attempting to improperly import limitations into the construction of "display."

The Court concludes that the phrase "display" is properly construed as "a device capable of displaying recorded images."  The Court, however, declines to construe "display" to include the additional language proposed by Stealth Cam—that the display "is contained in a housing that is movably attached to the main camera body and acts as a lens cover when the video camera is not in use"—as doing so would import limitations from the specification into the claim.

### 3.      "liquid crystal display"

The parties dispute the meaning of the term "liquid crystal display" as it appears in claim 18 of the '038 Patent, and claim 10 of the '196 Patent:  "The apparatus of claim **10**, wherein the display is a liquid crystal display."  ('196 Patent, c. 8, ll: 6-7.)  This term is a further limitation on the type of display.  The parties both propose constructions that mirror their proposed constructions for "display."  Holmberg submits that the term should be construed as "a device that gives information in a visual form utilizing a liquid crystal based screen."  Stealth Cam proposes that the term be construed as "a liquid crystal device capable of displaying recorded images" and further that it "is movably attached to the main camera body and acts as a lens cover when the video camera is not in use."

Based on the Court's construction of the term "display," the Court construes the term "liquid crystal display" as "a liquid crystal device capable of displaying recorded images."

4. **"when the cover is detached from the rear end of the camera body"**

The parties dispute the meaning of "when the cover is detached from the rear end of the camera body" as it appears in claim 12 of the '038 Patent:

> **12**. The camera of claim **11**, wherein at least one of the video recorder and the battery compartment are accessible when the cover is detached from the rear end of the camera body.

('038 Patent, c. 6, ll: 64-67.)

Holmberg asserts that this term is properly construed as "when the cover is partially separated or completely separated from the rear end of the camera body." (Doc. No. 63 at 15.) Stealth Cam contends that the term is properly construed as "when the cover is completely separated from the rear end of the camera body." (Doc. No. 71 at 20.)

Holmberg asserts that the claims and specification are consistent with his proposed construction and points out that claim 12 is dependent upon claim 11, which states: "The camera of claim **10**, wherein the cover is at least partially detachable from the rear end of the camera."

Stealth Cam agrees that claim 12 is dependent on claim 11, but points out that where claim 11 uses the phrase "wherein the cover is at least partially detachable from the rear of the camera body," claim 12 uses the phrase "detached from the rear end of the body." Stealth Cam agrees that the plain language of claim 11 only requires that the cover be partially detachable from the camera body, but emphasizes that the plain

language of claim 12 specifically does not include the term "partially detachable," but instead requires that the cover be "detached."

When different words or phrases are used in separate patent claims, the general presumption is that the terms have different meanings. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).[7] Here, it is presumed that the term "detached" in claim 12 has a different meaning than "partially detachable" in claim 11. The plain language of claim 12, along with the presumptions accorded under the doctrine of claim differentiation, lead the Court to conclude that the term is properly construed as "when the cover is completely separated from the rear end of the camera body."[8]

### 5.    "for mounting to a weapon"

The parties originally disputed the meaning of the term "for mounting to a weapon" as it appears in claims 1 and 19 of the '038 Patent: "A camera for mounting to a weapon." ('038 Patent, c. 6, ll: 25 & c. 7, ll:19.)

---

[7]    In addition, the presence of a dependent claim (here, claim 12) that adds a limitation (i.e., being detached) gives rise to the presumption that the limitation is not present in the independent claim. *Phillips*, 415 F.3d at 1315.

[8]    This construction is consistent with the portion of the specification cited by Holmberg:

> The weather cover **12** also provides easy access to the cassette holder **58** and the battery **60**. The operator simply has to unscrew the weather cover **12** to put in a video cassette or replace the battery **60**.

('038 Patent, c. 4, ll: 18-21.) That the weather cover can be unscrewed by the operator to put in a video cassette or to replace a battery suggests that the weather cover is completely detached. Moreover, Figure 5 shows the weather cover being completely detached from the rear end of the camera.

Holmberg originally asserted that this term either needs no construction or is properly construed as "capable of being mounted to a weapon." (Doc. No. 63 at 17.) Stealth Cam originally proposed that the term should be given its plain and ordinary meaning, and reiterated that all claims are limited to a video camera capable of being mounted to a weapon for use in game hunting. (Doc. No. 70 at 22.) During the *Markman* hearing, the parties indicated that they did not have a disagreement on this term, and that mounting on a weapon means being capable of being mounted on a weapon. (Hearing Tr. at 88-89.)

### 6.      "sealed"

The parties dispute the meaning of term "sealed" as it appears in claims 10 and 17 of the '793 Patent. Claim 10 reads, in part: "A camera for mounting to a functional weapon, the camera comprising: An elongated sealed housing having a front end and a rear end." ('793 Patent, c. 7, ll: 2-5.) Claim 17 reads: "The camera of claim **10**, wherein the elongated sealed housing comprises a camera body attached to a weather cover, the weather cover providing access to the battery compartment." (*Id.*, c. 8, ll: 14-17.)

Holmberg contends that the term is properly construed as "closed tightly." (Doc. No. 63 at 19.) Stealth Cam contends that the term should be construed as "protected from the weather and other environmental conditions likely to be encountered outside." (Doc. No. 70 at 23.) Both parties contend that their proposed constructions are consistent with the intrinsic evidence in the '793 Patent.

The following portions of the '793 Patent specification relate to the term

"sealed."[9]

> This seal connection not only keeps the liquid crystal display housing member **18** in the non-operational position, it also protects the lens **26** when the video camera is turned off.  This is an important feature because the video camera is likely to be exposed to harsh environments as a hunter pursues his or her game.  My design not only protects the lens **26** from scratches, as the hunter makes his or her way through the woods or brush, it also protects the lens from weather conditions.

('793 Patent, c. 3, ll: 5-13.)

> As the weather cover **12** is screwed onto the main camera body **10** it comes in contact with a rubber ring **41** thereby sealing the internal components from the weather.

('793 Patent, c. 4, ll: 21-23.)

Holmberg asserts that Figures 1 and 14 of the '793 Patent show an elongated

housing closed tightly.  Holmberg also cites to the following dictionary definitions of

"sealed":  "to close with or as if with a seal" or "to close hermetically"; and the phrasal

verb "seal off"—"to close tightly or surround with a barricade or cordon."  (Doc. No. 63

at 20-21.)  Stealth Cam points to Figures 2, 3 and 5 to support its contention that the lens

is sealed to protect the lens from weather and other environmental conditions.

The Court concludes that Stealth Cam's proposed construction is not supported by

the intrinsic evidence as it improperly imports limitations from the specification into the

claim.  The specification notes examples of what the "elongated sealed housing" can

---

[9]     The specification of the '245 Patent explains that the "video camera is designed to withstand the harsh conditions a video camera will be exposed to while game hunting. [The] video camera has seals that protect the lense [sic] and internal components from the weather and other conditions likely to be encountered."  ('245 Patent, c. 2, ll: 5-9.)

accomplish, but it does not specifically define the term as proposed by Stealth Cam. Thus, the Court concludes that the term "sealed" is properly construed as "closed tightly."

### 7. "mounting rail"

The parties dispute the meaning of the term "mounting rail" as it appears in the following claims of the '793 Patent, '038 Patent, and '196 Patent:

> **10.** A camera for mounting to a functional weapon, the camera comprising . . . a mounting rail extending along the housing from the front end toward the rear end, the mounting rail for mounting the camera to the functional weapon.

('793 Patent, c. 7, ll: 3-9.)

> **10.** A camera comprising . . . a mounting rail extending parallel to the camera body.

('038 Patent, c. 6, ll: 53-61.)

> **19.** A camera for mounting to a weapon, the camera comprising . . . a mounting rail extending parallel to the housing for mounting the camera to a weapon.

('038 Patent, c. 7, ll: 16- c. 8, ll: 8.)

> **1.** An apparatus comprising . . . a mounting rail located on an exterior surface of the housing.

('196 Patent, c. 6, ll: 25-34.)

> **10.** A [sic] apparatus comprising . . . a mounting rail located on an exterior surface of the housing for mounting the housing to an object.

('196 Patent, c. 6, ll: 56-64.)

   **19.**  The apparatus of claim **10**, wherein the mounting rail is configured to attach the camera to a weapon.

('196 Patent, c. 8, ll: 8-9.)

Holmberg contends that the term is properly construed as "an elongated structural member with a cross-section shaped to correspond to a track in a mount to permit longitudinal sliding movement into and out of the track in the mount."  (Doc. No. 63 at 24.)  Stealth Cam contends that the term should be construed as "a bar or track with parallel edges corresponding to a channel mount."  (Doc. No. 70 at 24.)

Both parties cite to the specification for support, including the following portions and Figures therein:

> As FIG. **14** illustrates, the video camera is attached to the mounting bracket by sliding the camera mount member **14** into the track of the lower mount member **92**.  When the camera mount member **14** is positioned far enough into the track of the lower mount member **92** it is locked into place.  This is to ensure that the camera will not inadvertently fall off the weapon.

('038 Patent, c. 5, ll: 16-21.)

> FIG. **16** illustrates how the camera mount member **14** locks into place with the lower mount member **92**.  As the camera mount member **14** slides along the track in the lower mount member **92** . . . .

('038 Patent, c. 5, ll: 41-44.)

Holmberg asserts that Stealth Cam's proposed construction improperly reads in the limitation of parallel edges as being necessary for sliding into a track.  Holmberg argues that neither the claim language nor the patent specification require parallel edges. Stealth Cam, however, argues that because the specification explains and illustrates (through the above passages) that the camera mount member (or, the mounting rail) slides

into a "track," the mounting member must be a bar with parallel edges to slide into the track.

The Court agrees with Holmberg on the construction of this term. In particular, the specification provides an example of a track having parallel edges, but does not require parallel edges on the mounting rail. Thus, the Court concludes that the term "mounting rail" is properly construed as "an elongated structural member with a cross-section shaped to correspond to a track in a mount to permit longitudinal sliding movement into and out of the track in the mount."

### 8. "extending parallel"

The parties dispute the meaning of the term "extending parallel" as it appears in claims 1, 10, 19 and 20 of the '038 Patent: "a mounting rail extending parallel to the housing"; "a mounting rail extending parallel to the camera body"; "[a] mounting rail extending parallel to housing for mounting the camera to a weapon"; and "a mounting rail extending parallel to the camera body for mounting the camera to a weapon." ('038 Patent, c. 6, ll: 34; c. 6, ll: 63, c. 8, ll: 7-8; c. 8, ll: 16-17.)

Holmberg contends that the term is properly construed as "the mounting rail has a longitudinal axis parallel to the central axis of the housing/camera body and the primary (longitudinal) dimension of the mounting rail extends in the primary (longitudinal) direction as the housing/camera body." (Doc. No. 63 at 22-23.) In support, Holmberg points to Figure 1 of the '038 Patent, which is a perspective view of how the video camera is mounted on the barrel of a firearm.

Stealth Cam contends that the term is indefinite under 35 U.S.C. § 112 because it

is a subjective term, and there is no objective basis for interpretation of the term "extending parallel" that allows a person of ordinary skill in the art to determine the bounds of the claimed subject matter.  (Doc. No. 70 at 28.)  In particular, Stealth Cam argues that:  a camera body is a three-dimensional object and thus, has three dimensions along which the mounting rail can extend parallel; and the specification does not inform a person of ordinary skill in the art of the dimension of the camera body to which the mounting rail extends parallel.

After a review of the claim language and intrinsic evidence, the Court concludes that a reasonable meaning of "extending parallel" can be ascertained, and that the term should be construed as "the mounting rail has a longitudinal axis parallel to the central axis of the housing/camera body and the primary (longitudinal) dimension of the mounting rail extends in the primary (longitudinal) direction as the housing/camera body."

### 9.    "a microphone for receiving sound located on an exterior surface of the housing"

The parties dispute the meaning of the term "a microphone for receiving sound located on an exterior surface of the housing" as it appears in claim 12 of the '793 Patent: "[a] microphone for receiving sound located on an exterior surface of the housing"; and claim 13 of the '196 Patent:  "[a] microphone for receiving sound, the microphone located on an exterior surface of the housing."   ('793 Patent, c. 8, ll: 1-3; '196 Patent, c. 7, ll: 7-8.)

Holmberg contends that the term is properly construed as "a microphone having an outermost entrance where sound is received that is located at an exterior surface of the housing." (Doc. No. 63 at 31.) Stealth Cam contends that the term should be construed as "a microphone located on the outside surface of the housing." (Doc. No. 70 at 26.)

Holmberg argues that the figures of the '793 and '196 Patents show a microphone with an outermost entrance where sound is received that is located at an exterior surface of the housing. ('793 Patent, c. 2, ll: 54-58.) Holmberg also asserts that electrical components of the microphone are located inside the camera case. (*See* '793 Patent, Fig. 6.) Stealth Cam asserts that Holmberg's proposed construction violates the general presumption that different terms have different meanings. In particular, Stealth Cam points out that the phrase "a microphone for receiving sound located on an exterior surface of the housing" must have a different meaning from the phrase in claim 3—"a microphone attached to the housing." ('793 Patent, c. 6, ll: 51.) Stealth Cam asserts that the meaning must be that the microphone is located *completely* on the outside surface of the housing, otherwise the microphone would simply be *attached* to the housing.

While it is true that the inventor used both the phrase "a microphone attached to the housing" in claim 3 and "a microphone for receiving sound located on an exterior surface of the housing" in claim 12, the Court concludes that the general presumption that those two phrases would have different meanings is rebutted here. A careful review of the specification reveals that all embodiments disclose an inlet at or on the exterior surface, but none show a microphone protruding outside of the housing. Indeed, all Figures of the '793 and '196 Patents show a microphone with an outermost entrance that

25

is located at an exterior surface.  Figure 6 also reveals that electrical components of the

microphone are located inside the camera case.  The Court concludes that Holmberg's

proposed construction is consistent with the intrinsic evidence and comports with the

patent as a whole.   Thus, the Court construes the phrase as "a microphone having an

outermost entrance where sound is received that is located at an exterior surface of the

housing."

### 10.   "partially detachable"

The parties dispute the meaning of the term "partially detachable" as it appears in

claim 11 of the '038 Patent:  "wherein the cover is at least partially detachable from the

rear end of the camera body."  ('038 Patent, c. 6, ll: 62-63.)  Holmberg contends that the

term is properly construed as "capable of being at least partially separated."  (Doc. No. 63

at 29.)  In support, Holmberg cites to the following portion of the specification:

> The video camera has a cylindrical weather cover **12** that screws onto the
> main camera base **10**.  This is illustrated in FIG. **5**.  As the weather cover
> **12** is screwed onto the main camera body **10** it comes in contact with a
> rubber ring **41** thereby sealing the internal components from the weather.
> The weather cover **12** also provides easy access to the cassette holder **58**
> and the battery **60**.  The operator simply has to unscrew the weather cover
> **12** to put in a video cassette or replace the battery **60**.

('038 Patent, c. 4, ll: 13-21.)  Holmberg also cites to Figure 5, suggesting that it shows a

cover that is capable of being at least partially separated.

Stealth Cam contends that the term is indefinite because it is a subjective term and

the specification does not use or define the term "partially detachable" so as to inform a

person of ordinary skill in the art what degree of detachment would satisfy the "partially

detachable" requirement.  (Doc. No. 70 at 29.)

After a review of the claim language and intrinsic evidence, the Court agrees that the claim is indefinite. The term is not used or defined anywhere in the intrinsic evidence and the term itself does not explain what is meant by "partially detachable." There is no objective basis for which to allow a person of ordinary skill in the art to determine what degree of attachment would satisfy the requirement of being "partially detachable." Accordingly, the term is indefinite.

### 11.    "attaching system for securing the mount to an object"

The parties dispute the meaning of the term "attaching system of securing the mount to an object" as it appears in claims 11 of the '196 Patent:  "a mount having a first side and a second side, the first side including a recess for receiving the mounting rail and the second side including an attaching system for securing the mount to an object." ('196 Patent, c. 6, ll: 66-c. 7, ll: 2.)  Holmberg contends that the term is properly construed as "second side of the mount is shaped for securing the mount to an object." (Doc. No. 63 at 37.)  Stealth Cam contends that even though the term does not include the word "means," it is governed by 35 U.S.C. § 112(6) because it recites function without reciting sufficient structure for performing that function.  (Doc. No. 70 at 31.)  At the *Markman* hearing, counsel for Holmberg indicated that treating the term as a "means plus function" claim is acceptable and that the issue is between their two different proposed constructions and what constitutes the supporting structure for the function.  (Hearing Tr. at 134.)  The parties further agreed that the function of "attachment system" is securing

the mount to an object, and they further agreed to the corresponding structure.  (*Id*. at

134-136.)[10]

### ORDER

Therefore, **IT IS HEREBY ORDERED** that the claims at issue are construed as

set forth in this Memorandum Opinion and Order.

Dated:  July 15, 2013                          s/Donovan W. Frank
                                                     DONOVAN W. FRANK
                                                     United States District Judge

---

[10]       In addition, at the hearing, the parties agreed to constructions for the following
previously disputed terms:  "the housing is substantially cylindrical"; "a microphone
attached to the housing"; and "mount for receiving the mounting rail."